Filed 7/15/24  In re M.R. CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.R., et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>K.R., et al.,<br><br>     Defendants and Appellants. | G063458<br><br>(Super. Ct. Nos. 23DP0858, 23DP0859)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Julie Anne Swain, Judge.  Affirmed.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant K.R.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant J.R.

Leon J. Page, County Counsel, Debbie Torrez, Supervising Deputy, and Aurelio Torre, Senior Deputy County Counsel, for Plaintiff and Respondent.

\*     \*     \*

K.R. (Mother) and J.R. (Father) separately appeal from the Orange County Juvenile Court's jurisdictional and dispositional orders declaring their two children, M.R. (13 years old) and Mc.R. (12 years old), dependents of the juvenile court and removing them from parental custody. The court found the children came within its jurisdiction under Welfare and Institutions Code section 300, subdivision (b)(1)[1], and removed the children from the parents' care.

Both Mother and Father contend the court's jurisdictional order must be reversed because there was insufficient evidence of a substantial risk to the children. They also argue there was insufficient evidence to support the dispositional order removing the children from their custody. We conclude the court's findings were supported by substantial evidence and therefore affirm.

_____

[1] All further statutory references are to the Welfare and Institutions Code.

2

On August 8, 2023, Mother, Father, M.R.,[3] and Mc.R. were living in an RV parked temporarily outside the maternal grandfather's home. Orange County Sheriff Department deputies and Orange County Fire Authority paramedics were called after Mother had difficulty breathing and lapsed into unconsciousness. Upon arrival, the paramedics administered multiple doses of Narcan, a drug which reverses the effects of opioid overdose. Mother then regained consciousness and was transported to the hospital. Although Father indicated to the sheriff's deputies the Mother did not use drugs, the deputies at the scene suspected a fentanyl overdose.

Father and Mc.R. were outside of the RV with Mother when the sheriff's deputies and paramedics arrived. One of the sheriff's deputies contacted M.R., who indicated he was "stuck" inside the RV and "needed help" as he was "trapped behind a 'pop-out' section of the RV." Deputies were able to free M.R. after getting electrical power to the RV. When deputies entered the RV, they observed "what appeared to be unsuitable living conditions for children" inside. Various objects, such as "trash, miscellaneous boxes, electrical tools, [and] food items" were cluttering the RV floor, and there was "not much room to move around inside the RV due to all the clutter." The floors were dirty, and stains that "appeared to be blood" were observed on the ceiling. The RV had a "foul odor." Two cats and a large dog

---

[2] The following facts are taken from the reports prepared by the Orange County Social Services Agency (Agency) which were admitted into evidence at the jurisdiction and disposition hearing, discussed *post*.

[3] M.R. informed the Agency he identifies as male and uses male pronouns. We will use M.R.'s chosen pronouns.

were also living in the RV.   Father told deputies the blood stains occurred when he was bitten by a dog.  Sheriff's deputies noted both children "had unkempt messy/dirty hair, no shoes, dirty feet and dirt underneath their fingernails, and wore dirty clothes which gave the appearance [they] had not bathed[/]showered for some time and did not have spare clean clothing to wear."  A social worker who later contacted both children on the same day noted each had "visibly greasy" hair, with "blackened dirt" under their finger and toe nails.

At some point, on August 8, 2023, the children ran into the maternal grandfather's home.  Sheriff's deputies reported when Father went inside to retrieve the children, the maternal grandfather "yelled out and stated the father was being very aggressive."   Father also reportedly refused to cooperate with the sheriff's deputies and would not let them enter the RV.  The deputies arrested Father and placed the children in protective custody.  They were temporarily detained at the Orangewood Children and Family Center before being placed with their paternal grandmother.

When interviewed by a social worker on August 8, 2023, Mother stated she had "an accidental exposure to an opioid and she has been trying to figure out how something like this could happen."  She later stated, in the same interview, her accidental opioid exposure may have been due to "Michelle," a woman she explained was an addict who had stayed in the RV with them, and was last with them on August 7, 2023.  Father wanted to help Michelle quit drugs and had obtained an opioid dependency treatment drug for her.  Mother denied any history of drug or alcohol abuse.  Mother stated when she started having difficulty breathing, she believed she was having an incident of heart failure, similar to a past condition for which she was hospitalized.  After her hospitalization, Mother was on permanent disability

4

and had a weak heart. Father had been acting as her paid full-time caregiver.

When Father was interviewed by the social worker on August 8, 2023, he indicated he was surprised Narcan revived Mother because he believed she had not taken any opioids. Father indicated Mother "is very careful because of her heart condition."

During its investigation, the Agency noted multiple relatives had expressed concerns as to Father's drug use history. The paternal grandmother reported to the social worker that when Father was growing up he "moved from relative to relative after a divorce and then began using drugs." The paternal aunt indicated to the social worker she was concerned because Father's current behavior "is how he acted the first time when he was on drugs." Additionally, a January 2022 Orange County Sheriff's Department record indicated the maternal aunt had requested a welfare check on the children due to her concern Father was using methamphetamine and was abusive. When asked by the social worker, Father denied any current or past substance abuse issues.

The Agency also noted Mother had called the Orange County Sheriff's Department in June 2023 to report an incident of domestic violence perpetrated by Father. According to the sheriff's report for that incident, Mother told deputies she had squirted dish soap on Father during an argument. In response, Father "grabbed and scratched her face with his nails," and bit Mother on her arm, hand, and pinky finger. Father then pushed Mother to the ground. Mother also told the deputies Father tried to close the sliding glass door on her and grabbed a solar panel, which hit her on the forehead. Father then pointed an airsoft gun at Mother but did not shoot.

5

Mother jumped out of the RV's window and ran to a nearby hotel to call law enforcement.

Sheriff's deputies who responded to the June 2023 incident observed visible injuries to Mother's forehead. She also had two bite marks on her right arm, left hand and pinky, and scratches on her neck and back. Mother declined the deputies' offers for medical attention, prosecution, or an emergency protective order. Two days later, Mother called the sheriff's department to request an emergency protective order and the prosecution of Father. Mother reported she and the children were then staying in a hotel. Mother's request for an emergency protective order was denied because the parents were no longer living together.

When interviewed by the social worker on August 8, 2023, Mother "denied any current domestic violence issues." She reported she and Father had worked out their problems and the June 2023 incident was simply a misunderstanding. During this interview, Mother suggested she and Father were different from other couples because she is strong and she and Father are trained in advanced martial arts. She stated she was not in any danger and did not fear Father. During his interview with the social worker on August 8, 2023, Father also denied any domestic violence occurred in the home. Additionally, Father explained he was upset at the maternal grandfather earlier that day as he believes the maternal grandfather abused Mother as a child.[4]

---

[4] A few weeks later, Father sent text messages to the social worker denying allegations he was "aggressive" at the time of the incident on August 8, 2023. He also provided an audio recording he posted on YouTube purportedly taken at the time of the incident.

When interviewed by social workers on August 8 and 9, 2023, both children reported they have heard their parents yelling at each other during arguments. Mc.R. indicated, although he has not seen the parents hit each other during these fights, he knows they do as he has heard each ask, "'[W]hy did you hit me[?]'" Mc.R. reported having seen Mother with a nosebleed after the parents were fighting. He also saw Mother with a "very large bump" on her head about a month earlier, which Father said happened when he accidentally slid a solar panel at Mother. M.R. stated the parents mostly yell, but "sometimes fight with their bodies." M.R. told the social worker a "big fight" happened in June when Mother got a bump on her head because something fell onto it. M.R. indicated the parents had been fighting more often lately and Mc.R. stated the fights were getting worse. M.R. told the social worker his parents had fought on August 8 and the family dog bit Father's hand. In a later interview with a different social worker, M.R. also reported he had seen "scarring and bruising on both" parents due to "domestic violence."

On August 17, 2023, M.R. told a social worker "'[t]he shower [in the RV] didn't work, and [they] did not have a sewer system.'" M.R. also initially told the social worker his family had food, but in a subsequent interview, he stated they did not always have enough food at home because the parents would run out of money on their EBT card. He further reported there were maggots in the refrigerator so they "'ate out a lot.'" Mother later confirmed with the social worker the freezer had stopped working and the food spoiled, but she indicated when she realized this, "'it stopped'" and "'[the food] hadn't even been there that long.'" Father indicated to the social worker the RV had a fresh water tank and electricity from solar panels. He

7

explained the "mess inside the RV" was because the RV had been recently impounded and the impound lot "messed everything up inside."

The children reported to the social workers Father homeschooled them, but they had not done "'school in months.'" According to the social worker, the children appeared to lack basic communication and writing skills appropriate for their ages. The social worker noted, when asked to write their names and dates of birth, both children struggled to complete the task, and Mc.R. needed to ask M.R. when Mc.R.'s birthday was. The parents reported the children had not seen a doctor or dentist for three to five years.

The children were placed with their paternal grandmother, where they reported feeling safe and comfortable. They initially struggled with attending a regular school, but eventually performed well academically.

The Agency reported concerns the parents were attempting to coach the children on multiple occasions. In September 2023, the paternal grandmother told the social worker Father called a few days prior and told the children they "'all need to have the same story.'" The paternal grandmother also reported finding the children talking to Mother at 3:30 a.m. without the paternal grandmother's knowledge, and M.R. was upset as his parents told him "'to change [his] story'" because they all needed to "'have the same story.'"

The parents were thereafter informed by a social worker all future electronic communication would be supervised by Agency staff due to "disparag[ing] comments made in a contact between the parents and the children . . . ." The social worker reiterated to the parents not to discuss the court case with the children and to refrain from having any unsupervised online contact. At a subsequent hearing regarding the parents' visitation, the court reiterated its order to the parents through counsel that they are "not to

discuss any aspect of this case with [the children], as previously ordered." A few days after this hearing, the paternal grandmother reported finding text messages from Father on Mc.R.'s cell phone that he was coming to pick up the children, and to, "'Get your stories straight because things are not as bad as it seems when we were younger.'" Father later acknowledged to the social worker he had violated court orders by texting the children, but claimed Mother was not involved. Father had also allegedly been calling and verbally harassing the paternal grandmother.[5]

Per the Agency's reports, there was uncertainty as to where the parents were living from August through November 2023. They provided multiple addresses and sometimes failed to inform the social workers of changes in their address. In November 2023, Mother reported she and Father had signed a rental agreement for an apartment in Lake Forest. She

---

[5]  In text messages to the social worker on October 19, 2023, Father denied the paternal grandmother's reports regarding Father's behavior. Father also texted, among other statements, "'The system and our family abandoned us and then we are punished for the results despite our greatest effort to stabilize.'" After the social worker explained a child welfare case could last from "6 months to 1.5 years," Father responded, "'Nope that is not okay with me. Sorry. But I'm taking them back then. I'm being straight out with it. We are moving up north today.'" When the social worker explained he could not advise Father on what to do, but if Father showed up at the paternal grandmother's home unauthorized, law enforcement would be contacted, Father responded, "'Progress? CPS kidnapped my kids while I was wrongfully detained.'" He also texted, "'If you can't undo what has been wrongfully done. That is insane. This so called process is a bunch of people shuffling around paper. That's what landed us in this mess in the first place.'" (Italics have been removed in the quotations of Father's texts in this footnote.)

provided the social worker with their new address and invited the social worker to schedule a home assessment.

In December 2023, a social worker went to the parents' apartment for the assessment. The social worker knocked on the door but there was no response. She called and texted Mother, who did not respond. When Mother arrived, she indicated she had forgotten her key and needed to call her landlord. The social worker suggested Mother go to the apartment leasing office so she could be let back into the apartment, but Mother refused. Instead, Mother informed the worker she had to leave to get the key from Father and would return. The worker informed Mother she would wait for Mother's return. When the social worker later returned to the apartment, Mother let the worker inside.[6]

Although Mother denied anyone else was present in the apartment, the social worker observed a man on the couch under a blanket. Mother stated he was her landlord and was napping because he was sick. Mother stated his name was "Saul" but could not recall his last name. It appeared to the social worker that much younger children lived in the apartment due to the presence of toys and unfamiliar names written on the wall. The social worker could not determine whether Mother was living in the apartment. Mother indicated she was subletting the apartment and, when the social worker asked Mother for a copy of the lease, Mother stated she would find a copy. A child welfare referral search for that Lake Forest

---

[6] At the time of the assessment, Mother told the social worker Father was not on the lease, he lived in the RV, and she and Father were not together. Mother also indicated, if she was asked to get a restraining order against Father, she would not do so because "'he needs to be [her] caregiver.'"

apartment revealed a recent referral as of Mother's purported landlord, Saul, involving mental health issues and domestic violence.

PROCEDURAL BACKGROUND

I.

CHILD WELFARE PETITION

On August 11, 2023, the Agency filed a child welfare petition, alleging the children came within the jurisdiction of the court under section 300. The factual allegations in the petition pursuant to section 300, subdivision (b)(1), as later amended by interlineation (the amended petition), were as follows: (1) Mother had an unresolved problem with substance abuse, including, but not limited to, "fentanyl and/or other opioids," based on the August 8, 2023 episode in which she was revived by multiple doses of Narcan; (2) Father had a history of substance abuse, which may include, but was not limited to, methamphetamine, and "which may be an unresolved problem"; (3) the parents failed to ensure the children had a safe and sanitary home environment as the RV was described as unsanitary with hazardous conditions; (4) Mother had unresolved mental health issues; (5) Father had unresolved anger management and/or mental health issues; (6) the parents had exposed the children to domestic violence; and (7) Mother had a criminal conviction and/or arrest for driving under the influence.

II.

DETENTION REPORT AND HEARING

Neither parent appeared for the detention hearing in August 2023, and the matter was continued for three days at their counsel's request. Neither parent appeared for the rescheduled hearing. Parents' counsel claimed Mother had gone to the hospital and requested a one-day

11

continuance, which was granted.  Mother then appeared the next day, but Father failed to appear.

At the detention hearing, the court found the Agency had made a prima facie showing the continued detention of the children was necessary. (§ 319.)  The court ordered weekly supervised visitation for both parents, as well as electronic communication.  The parents were ordered not to discuss any aspect of the case with the children.  The court encouraged the parents to engage in the "programs, therapy and other services the social worker will be offering."

III.

JURISDICTION AND DISPOSITION HEARING

The juvenile court conducted a combined jurisdiction and disposition hearing on multiple dates in November and December 2023. Father was absent from nearly every hearing date, while Mother appeared more regularly, although she also missed a few hearing dates.  At the end of the hearing, the court received seven Agency reports into evidence.[7]  The Agency's recommendation in each of those reports remained the same:  for the court to sustain the petition as to the children, declare them dependents, and order family reunification services.  The court also received Mother's exhibits identified as "A through M."  In addition, the court heard testimony from Mother, M.R., Mc.R., and two social workers at the hearing.

---

[7] These reports were:  (1) Jurisdiction/Disposition Report, dated September 19, 2023; (2) Addendum Report, dated October 3, 2023; (3) Addendum Report #2, dated October 24, 2023; (4) Addendum Report #3, dated November 1, 2023; (5) Addendum Report #4, dated November 22, 2023; (6) Redacted Addendum Report #5, dated December 4, 2023; (7) Addendum Report #6, dated December 6, 2023; and (8) Addendum Report #7, dated December 6, 2023.

12

During Mother's testimony, she denied using fentanyl, opioids or methamphetamine, indicating she had only used marijuana to address her medical issues and had done so no more recently than 2021. Mother stated she would only use marijuana outside the presence of the children. She denied overdosing on fentanyl on August 8, 2023, denied having been accidentally exposed to fentanyl, and denied telling M.R. she had ingested candy with fentanyl on it. Mother acknowledged initially telling a social worker she may have been exposed to fentanyl through Michelle, their houseguest, who Mother stated had a "history of fentanyl use." However, Mother said this was only a suspicion of hers and her drug tests after the August 8 incident have come back negative.[8] Mother acknowledged Michelle had "a history of fentanyl use," but denied having ever left the children alone with Michelle.

As for their home, Mother testified the RV "was safe and sanitary, meaning there were no physical hazards, no chemical hazards, [and] no emotional hazards." Mother also stated she slept at her new Lake Forest apartment but spent her days with Father. Mother indicated she had not yet provided the sublease agreement to the social worker, but she could do so.[9]

_____

[8] In the Agency's Jurisdiction/Disposition Report, Mother reportedly told a social worker, who interviewed Mother on August 28, 2023, her medical file for the August 8 incident states it was an "'accidental exposure.'" Mother reported being drug tested in the emergency room one week after the August 8 incident and "no drugs were found in her system then."

[9] A copy of Mother's sublease agreement was later marked and admitted into evidence at the hearing.

As to her relationship with Father, Mother testified she "would mainly yell" which "would trigger him to also yell back," but this was "the only thing that qualifies as aggressive," and Mother indicated she was working on her yelling. An incident during which Father broke M.R.'s cell phone was an isolated event according to Mother, and Father was not mad at M.R. at that time. Mother also stated "[a]nytime [Father] would have stricken me it would have been consensual because, again, we're martial artists . . . like to the outside world, play fighting doesn't look like play fighting. To us it's play fighting. Sparring looks like fighting, but to us it's training." She said as martial artists she and Father would hit each other, and sometimes there would be a little blood. According to Mother, the children never witnessed any sort of physical domestic violence between her and Father.

Mother also testified she had started parenting and domestic violence classes in October 2023, but had not participated in drug testing. Mother stated she was willing to sign releases of information regarding the August 8, 2023 incident, but had not been asked to do so by the social workers.

Mc.R. testified he would change clothes about once a week when he lived in the RV. He denied seeing the parents use drugs except he had sometimes been around Mother when she smoked marijuana. Mc.R. has seen Michelle smoke marijuana with a "bong." Mc.R. would sometimes see his parents and Michelle smoke marijuana together. He has also sometimes been left alone with Michelle during the day.

Mc.R. acknowledged the parents would yell at each other and may have hit each other, but he "never really saw" this. He stated he felt "a little" scared when the parents argued. He testified his parents fought

14

"[v]ery often, like twice a week," and he has seen bruising on Mother. Mc.R. further testified he wanted to return home despite the parents' fighting as he loved them. Mc.R. confirmed Father had texted urging him to lie to the social workers.

M.R. testified he wanted to go home with his parents, "but not in the condition [they] were in before." According to M.R., the home was dirty, sometimes they ate only once a day, and sometimes he would go a "month or weeks" without changing clothes. M.R. was sometimes scared by the parents' arguments and the parents would sometimes involve the children in such arguments. M.R. was aware of instances when the parents' arguments would get physical, resulting in injuries to both. M.R. has seen "bite marks" on Mother's shoulder and hand. Mother told the children Father had bitten her during one of their fights. M.R. testified, during the incident involving the solar panel, Father took M.R.'s cell phone so Mother could not call the police. When M.R. asked Father to return the phone, Father "got mad and smashed it against the wall" and then against the kitchen sink's faucet. M.R. indicated Father told the children to "fix up our stories."

As for the incident on August 8, 2023, M.R. remembered telling a social worker Mother had eaten a candy with fentanyl on it. M.R. indicated Mother told the children she had "flipped a table while they were fighting" and "drugs got knocked onto the candy and then she ate it." Mother told M.R. the drugs were something Michelle had left in the RV. M.R. also has seen "white crystals in a little Pokemon bag" his parents had. M.R. had not seen Mother use any drugs.

Two social workers were called for purposes of cross-examination regarding their reports; both were questioned as to the parents' services. The first social worker also testified that although the parents had indicated the

15

RV had been renovated, the parents had not made the RV, in which they were living, available for assessment and no photos had been provided as to its renovated status.  The second social worker testified the Agency had provided "drug testing information" to both parents but neither parent had yet submitted to drug testing.

On December 7, 2023, the court sustained the amended petition, declared the children dependents of the juvenile court, and removed custody of them from both parents.  Family reunification services were ordered by the court for both parents.  The parents filed separate, timely notices of appeal.

DISCUSSION

Both parents contend the juvenile court's jurisdictional and dispositional orders removing the children from parental custody are unsupported by substantial evidence.[10]  We disagree.

I.

THE JURISDICTIONAL FINDINGS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

The juvenile court asserted jurisdiction over the children pursuant to section 300, subdivision (b)(1).  A juvenile court may exercise jurisdiction under this section if the court finds by a preponderance of the evidence that, as relevant here, "there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶] . . . [t]he failure or inability of the child's parent . . . to adequately supervise or protect the child. [¶] . . . [¶] . . . [and/or] [t]he willful or negligent failure of the parent . . . to provide the child with adequate food, clothing, shelter, or

---

[10]  Although Mother and Father filed separate appellate briefs, they joined in each other's arguments on appeal, so we will address their contentions together.

16

medical treatment." (§ 300, subd. (b)(1)(A) & (C); see *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561.) "'Facts supporting allegations that a child is one described by section 300 are cumulative.' [Citation.] Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.'" (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

The parents both contend the evidence was insufficient to support child welfare jurisdiction because "there was no evidence of a current risk of substantial harm" to the children at the time of the jurisdiction hearing. A juvenile court's jurisdictional finding can be affirmed on review "'if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) The reviewing court "'need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'" (*Ibid.*)

"A jurisdictional finding that the minor is a person described in section 300 must be made by at least a preponderance of the evidence. [Citations.] 'We review the jurisdictional findings for substantial evidence. [Citation.] We consider the entire record, drawing all reasonable inferences in support of the juvenile court's findings and affirming the order even if other evidence supports a different finding. [Citation.] We do not consider the credibility of witnesses or reweigh the evidence.' [Citation.] 'The parent has the burden on appeal of showing there is insufficient evidence to support the juvenile court's order.'" (*In re L.B.* (2023) 88 Cal.App.5th 402, 411–412.)

Paragraph b-6 of the amended petition alleged the parents "have exposed the children" to "domestic violence." The parents argue a finding of jurisdiction based on domestic violence also requires a showing of a "threat of harm to the children's *physical* safety." Father acknowledges "there was no

17

dispute that the parents had many verbal arguments." Mother argues she and the children reported the incident involving the solar panel as "an accident." She also points to her testimony the parents engaged in "'play fights'" as part of their martial arts training. In any event, both parents assert the children were not physically harmed or at "substantial risk of suffering serious physical harm" due to domestic violence as of the date of the jurisdiction hearing.

Relying on the children's testimony, the juvenile court found the parents had engaged in domestic violence and Mother was "in denial" as to the domestic violence between the parents. The fact the children did not suffer physical injury does not negate the substantial harm caused by these acts of domestic violence. "'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citations.] It is well settled that physical violence between a child's parents may support the exercise of jurisdiction under subdivision (b)(1) of section 300 where there is evidence that the domestic violence has placed the child *at risk* of physical harm and the violence is ongoing or likely to recur." (*In re L.B., supra*, 88 Cal.App.5th at p. 411.)

"The relevant inquiry under section 300, subdivision (b)(1), is whether circumstances at the time of the jurisdictional hearing ""'subject the minor to the defined risk of harm.'" [Citation.] 'The court may consider past events in deciding whether a child currently needs the court's protection.' [Citations.] Indeed, in a domestic violence situation, past violence is highly probative of the risk that violence may recur. [Citation.] To establish a defined risk of harm at the time of the hearing, there "'must be some reason beyond mere speculation to believe the alleged conduct will recur.'"" (*In re L.B., supra*, 88 Cal.App.5th at p. 411.)

18

In sustaining the amended petition's allegations, the juvenile court "heavily rel[ied] on the children's testimony" finding "their testimony to be accurate and credible, both historically and currently." Both children testified to hearing their parents fight and of being aware these altercations were at times physical, with both describing injuries they later observed on Mother. The children testified these incidents of domestic violence were recent, ongoing, and worsening in severity. Mc.R. told the juvenile court his parents fought "[v]ery often," and he has seen bruising on Mother. M.R. reported seeing "bite marks" on Mother's hand that Mother said were because Father had bitten her. M.R. reported the fights between the parents were getting worse. Both children also testified they were sometimes scared when these incidents occurred, and M.R. indicated at times the parents involved the children in their arguments. M.R. testified during the "one big fight with the solar panel," Father smashed his cell phone because Father did not want Mother to call the police.

Thus, based on the risk of harm arising from the parents' continuous cycle of domestic violence described by the children, and viewing the facts in the light most favorable to the court's decision below, substantial evidence supports the court's jurisdictional order. Additionally, since jurisdiction was proper as to the domestic violence allegation, we need not address the parents' other challenges to jurisdiction.

## II.
### THE DISPOSITIONAL FINDINGS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

The parents also contend there is insufficient evidence to support the juvenile court's removal order and further contend the court failed to consider reasonable alternatives to removal.

19

Before the court may order a child removed from his or her parent, it must find, by clear and convincing evidence, "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the [child] if the [child] were returned home, and there are no reasonable means by which the [child's] physical health can be protected without" removal. (§ 361, subd. (c)(1).) "The parent need not be dangerous, and the [child] need not have been actually harmed" for removal to be appropriate. (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.) "The focus of the statute is on averting harm to the child." (*In re Diamond H., supra*, 82 Cal.App.4th at p. 1136.)

"[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.)

Substantial evidence supports the court's finding, by clear and convincing evidence, the parents' domestic violence posed a substantial risk of harm to the children as they were exposed to a continuous cycle of recent domestic violence between the parents. However, the parents argue the evidence was insufficient to remove the children from their custody because

20

the children were not "at substantial risk of being physically harmed." Mother also specifically argues there was insufficient evidence to support the court's order removing the children from her care.

Although the children testified they never saw physical violence between the parents, they heard multiple acts of such violence, and observed injuries as a result. They were also sometimes frightened by the abuse. "Studies show that violence by one parent against another harms children even if they do not witness it." (Fields, *The Impact of Spouse Abuse on Children and Its Relevance in Custody and Visitation Decisions in New York State* (1994) 3 Cornell J.L. & Pub. Policy 221, 228, fn. omitted.) "Even if a child suffers no physical harm due to domestic violence, a 'cycle of violence between . . . parents constitute[s] a failure to protect [a child] "from the substantial risk of encountering the violence and suffering serious physical harm or illness from it."'" (*In re V.L.* (2020) 54 Cal.App.5th 147, 156.)

Additionally, the juvenile court found Mother to be "in denial" as to the parents' domestic violence. "A parent's denial of domestic violence increases the risk of it recurring." (*In re V.L., supra*, 54 Cal.App.5th at p. 156.) Here, the parents failed to acknowledge the harm to the children because they largely denied or minimized the domestic violence. Mother tried to explain away the violence by asserting the parents were merely engaged in practicing their advanced martial arts skills, even though Mother also reportedly suffered from a serious heart condition and required full-time care by Father. Mother additionally downplayed the domestic violence despite documentation by law enforcement of her physical injuries, which included bites, bruising, and scratches she received during the June 2023 incident. She also took the blame for triggering the parents' arguments. Based on the evidence regarding the parents' ongoing domestic violence,

21

substantial evidence supports the dispositional order removing the children from parental custody.

The parents further contend the court erred in failing to consider reasonable alternatives to removal, such as releasing the children to Mother's sole care or having the children's godfather live with Mother and the children.

Contrary to the parents' argument, the court explained in detail why the children could not be returned at that time to their custody: "Whether there were reasonable means to avoid removal or to allow the children to return home, parents have not taken advantage of any of the resources available to them. Mother has not signed a release to allow the workers to communicate with any programs or get information from any programs. Mother has not signed a release to access her medical records.

"Mother and [F]ather have limited their contact with the Social Services Agency. Father has pretty much removed himself from the picture. Father doesn't show up for court. They no-show for visits without notice.

"And the failure to follow court orders, which is a demonstrated pattern, the Court cannot expect people who don't show up to court when they are ordered to show up to comply with future court orders.

"The bottom line is neither parent has demonstrated a protective capacity to protect the children from substance use, neglect, and abuse, and the conditions of the home and domestic violence."

The court reasonably relied upon the parents' failure to cooperate with the Agency's investigation, limited engagement in services, and repeated violations of orders. There was no evidence the parents could or would change the behavior the court found harmful to their children. Father neither accepted responsibility nor showed contrition, suggesting to the social

22

workers he believed the child welfare proceedings involving his children were baseless. Mother minimized the seriousness of her fentanyl overdose, the condition of the RV, and the ongoing domestic violence, and she blamed herself for causing any arguments with Father. (*In re M.R.* (2017) 8 Cal.App.5th 101, 109–110 [juvenile court could consider parents' minimization of their conduct].) "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.)

Because the juvenile court's findings underlying the dispositional order removing the children from parental custody was supported by evidence sufficient to enable a reasonable fact finder to find it highly probable the fact was true, we affirm that order. (See *Conservatorship of O.B., supra,* 9 Cal.5th at pp. 995-996.)

DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed.

MOTOIKE, J.

WE CONCUR:

GOETHALS, ACTING P. J.

GOODING, J.